[Cite as *Ashland Global Holdings, Inc. v. SuperAsh Remainderman Ltd. Partnership*, 2023-Ohio-3556.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Ashland Global Holdings Inc. et al., | : | |
| Plaintiffs-Appellees, | : | |
| Speedway, L.L.C., | : | |
| Intervenor-Appellee, | : | No. 22AP-638 |
| v. | : | (C.P.C. No. 22CV-2398) |
| SuperAsh Remainderman Limited Partnership, | : | (REGULAR CALENDAR) |
| | : | |
| Defendant-Appellant. | : | |
| | : | |

D E C I S I O N

Rendered on September 29, 2023

**On brief:** *Arnold & Clifford, James E. Arnold, Gerhardt A. Gosnell, II*, and *Michael L. Dillard, Jr.*, for appellees Ashland Global Holdings Inc. and Ashland L.L.C. **Argued:** *Michael L. Dillard, Jr.*

**On brief:** *Roetzel & Andress, LPA, Jeremy S. Young*, and *Stephen D. Jones*, for appellee Speedway, L.L.C.

**On brief:** *Collins Roche Utley & Garner L.L.C.*, and *Richard M. Garner*, for appellant. **Argued:** *Richard M. Garner*.

APPEAL from the Franklin County Court of Common Pleas

DORRIAN, J.

{¶ 1} Defendant-appellant, SuperAsh Remainderman Limited Partnership ("SuperAsh"), appeals from a judgment of the Franklin County Court of Common Pleas granting plaintiffs-appellees, Ashland Global Holdings Inc. and Ashland L.L.C.

(collectively, "Ashland"), equitable relief from Ashland's failure to submit a timely notice to renew several commercial leases. For the reasons that follow, we affirm.

## I. Facts and Procedural History

{¶ 2} The present dispute concerns 24 different properties located throughout Ohio, Kentucky, Minnesota, Wisconsin, and South Dakota. Eight of the properties are in Ohio. SuperAsh leased the properties to Ashland, and Ashland subleased the properties to Speedway L.L.C. ("Speedway"). Speedway operates retail fuel and convenience stores on the properties.

{¶ 3} In 1990, Ashland owned the 24 properties at issue herein and completed a sale lease-back transaction involving the properties. Ashland sold an estate for 20 years in the land and improvements on the properties to State Street Bank and Trust Company of Connecticut, National Association ("State Street Bank"), an owner trust, and Ashland leased the land and improvements back from State Street Bank for a 20-year term commencing December 31, 1990. As part of the 1990 transaction, Ashland sold the remainder interest in the land which would follow the owner trust's 20-year estate to SuperAsh.

{¶ 4} In 1998, Ashland subleased the properties to Speedway's predecessor-in-interest, Speedway SuperAmerica L.L.C. The 1998 sublease occurred in connection with a joint venture between Marathon Oil Company and Ashland; Speedway SuperAmerica L.L.C. was a wholly owned subsidiary of the joint venture. Through the 1998 sublease, Ashland attempted to place Speedway SuperAmerica L.L.C. "in a position as close as possible to the position it would have been in" if the properties had been conveyed to Speedway SuperAmerica L.L.C. as a capital contribution. (Compl. at ¶ 18.) The 1998 sublease obligated Speedway SuperAmerica L.L.C. to pay Ashland only nominal rent of $1 per year per location. Speedway has continuously subleased the properties from Ashland since 1998.

{¶ 5} In 2010, SuperAsh's remainder interest in the land vested. On December 31, 2010, SuperAsh and U.S. Bank, National Association, the successor-in-interest to State Street Bank, executed 24 identical ground leases for each of the properties (the "ground leases"). Ashland leased the properties from U.S. Bank pursuant to a separate operating lease agreement.

{¶ 6} The initial term under the ground leases was for a five-year period, and the ground leases referred to the rent due under the initial term as "[b]asic [g]round [r]ent." (Compl., Ex. A, Ground Lease § 3.1.) The annual basic ground rent for the 24 properties was $512,400. Jay Woldenberg, SuperAsh's general partner, referred to the basic ground rent as "bargain rental rates." (Tr. Vol. I at 180.) The ground leases contained options to renew the leases for an initial five-year renewal term and two successive one-year renewal terms. The first one-year renewal term ended December 31, 2021 (the "2021 term") and the second one-year renewal term ended December 31, 2022 (the "2022 term"). During the initial five-year and successive one-year renewal terms, the rent would be the basic ground rent. Following the 2022 term, the ground lessee could continue renewing the ground leases annually, but the rent would increase from basic ground rent to fair market value rental rates.

{¶ 7} To exercise its option to renew the ground leases, the ground lessee had to notify SuperAsh "in writing of its election to extend the Term on or before the date which [was] one hundred twenty (120) days prior to the expiration of the Base Lease Term or the applicable Renewal Term." (Ground Lease § 3.2(c).) The parties stipulated that, to comply with the 120-day requirement, the ground lessee had to submit a renewal notice to SuperAsh on or before September 3, 2020 for the 2021 term and on or before September 3, 2021 for the 2022 term. The ground leases also contained an option for the ground lessee to purchase the properties. To exercise the purchase option, the ground lessee had to provide SuperAsh with notice at least 120 days prior to the expiration of the ground leases. If the ground leases expired and the ground lessee had not exercised the purchase option, the ground lessee's interest in the improvements on the land would "automatically vest" in SuperAsh. (Ground Lease § 15.3.)

{¶ 8} In 2013, Ashland purchased the owner trust's position under the ground leases and ownership of the improvements on the properties for $13,770,000. As such, Ashland became the ground lessee and the owner of the improvements. On April 17, 2015, Ashland provided SuperAsh with written notice of its intent to renew the ground leases for the initial five-year renewal term.

{¶ 9} On November 20, 2020, William D. Wallach, Ashland's external legal counsel located in New Jersey, sent an email to Ashland's vice president and treasurer, William

Whitaker. The email contained a draft renewal notice for the 2021 term and instructed Whitaker to print the renewal notice, "sign, and then send both it and the exhibits by email today, with the Federal Express copies to follow." (Joint Ex. 5.) Whitaker printed and signed the 2021 renewal notice on November 20, 2020. On November 23, 2020, Whitaker sent an email to Woldenberg with the signed 2021 renewal notice attached. Pursuant to Wallach's request, Whitaker also forwarded the November 23, 2020 email he sent to Woldenberg to Wallach. Woldenberg did not respond to Whitaker's November 23, 2020 email containing the untimely 2021 renewal notice.

{¶ 10} Whitaker stated that Ashland failed to provide SuperAsh with the 2021 renewal notice by the September 3, 2020 deadline due to "a great deal of complicating matters," including a "substantial amount of litigation." (Tr. Vol. I at 41-42.) In 2017, Ashland executed a "side-letter agreement" with Valvoline that conveyed the rights and obligations associated with the ground leases to Valvoline. (Tr. Vol. I at 41.) Ashland and Valvoline disputed the extent of the conveyance, including a dispute regarding which party was responsible for sending the renewal notices to SuperAsh, and the dispute resulted in litigation. Additionally, in October 2020, Speedway initiated arbitration against Ashland to require Ashland to exercise the purchase option in the ground leases and transfer the properties to Speedway.

{¶ 11} On February 22, 2021, Woldenberg sent a letter to the SuperAsh limited partners titled "Analysis of SuperAsh Ground Lease Renewal Matters." (Pltf.'s Ex. 4.) The analysis addressed Ashland's untimely 2021 renewal notice and noted that, although there was "an argument to be made that Ashland failed to timely execute the ground lease renewal," the argument was "not a clear winner." (Pltf.'s Ex. 4.) Woldenberg ultimately determined that the "prudent action would be to accept the [2021] renewal option at that time," due to the state of the COVID-19 pandemic and because the ground leases contained a no waiver clause. (Tr. Vol. II at 32.)

{¶ 12} On August 11, 2021, Wallach sent Whitaker an email titled "RE: Ashland/Speedway Lease – Renewal Notice."[1] (Deft.'s Ex. 6.) Wallach attached a draft 2022 renewal notice to the email and instructed Whitaker to return a signed copy of the renewal notice to him. Unlike the prior year, Wallach did not instruct Whitaker to send the

---

[1] The contents of the August 11, 2021 email were redacted from defendant's exhibit 6.

renewal notice to SuperAsh.  Wallach informed Whitaker he wanted to share the 2022 renewal notice "with Valvoline," which made sense to Whitaker "given the structure of the side letter and the litigation with Valvoline."  (Tr. Vol. I at 50.)  On August 11, 2021, Whitaker emailed a signed copy of the 2022 renewal notice to Wallach.

{¶ 13} On August 12, 2021, Wallach sent an email to Valvoline's attorney stating, "[a]ttached is the Lease Renewal Notice sent by Ashland to [SuperAsh].  As was the case last year, this notice is without prejudice to Ashland's rights."  (Joint Ex. 9.)  Wallach attached the signed 2022 renewal notice dated August 11, 2021 to his August 12, 2021 email.  However, Ashland had not sent the 2022 renewal notice to SuperAsh.

{¶ 14} Woldenberg realized that Ashland had not provided SuperAsh with the 2022 renewal notice by September 8, 2021, but he did not contact Ashland about the renewal notice at that time. On November 3, 2021, Woldenberg sent Whitaker an email stating that the ground leases would expire December 31, 2021 because Ashland had not exercised its option to renew the ground leases for the 2022 term.  Whitaker responded to Woldenberg's email 15 minutes later, attaching a copy of the signed 2022 renewal notice and stating, "I take it that you didn't receive the attached?  I'll connect with counsel since I'm not sure why this wasn't shared." (Pltf.'s Ex. 11.)

{¶ 15} Whitaker explained that as of November 3, 2021, "[he] didn't realize [the 2022 renewal notice] wasn't sent, or if it had been."  (Tr. Vol. I at 54.)  On November 11, 2021, Wallach sent an email to SuperAsh's attorney stating that the August 11, 2021 and November 20, 2020 renewal notices "were both sent by email and by Federal Express." (Deft.'s Ex. 11.)  Whitaker conducted an internal investigation at Ashland to determine how Ashland sent the 2022 renewal notice to SuperAsh, but was unable to find any evidence demonstrating that Ashland sent the 2022 renewal notice to SuperAsh.  The parties stipulated that Ashland had not sent a copy of the 2022 renewal notice to SuperAsh before November 3, 2021.

{¶ 16} SuperAsh and Ashland executed four separate tolling agreements between December 2021 and March 2022 to "preserve the status quo" under the ground leases while they attempted to negotiate a new lease agreement.  (Tr. Vol. I at 57; Joint Exs. 12, 13, 15, and 16.)  Pursuant to the tolling agreements, Ashland paid SuperAsh $250,000 per month in rent for January, February, March, and April 2022, as well as a tolling fee of 8 percent of

each month's rent.[2]  Although the fourth tolling agreement stated that Ashland would pay SuperAsh "$250,000 in rent for April," the agreement also stated that it would "terminate on April 15, 2022." (Fourth Tolling Agreement at ¶ 3, 4.)

{¶ 17} SuperAsh initially proposed that the parties execute a 15-year lease for the land and buildings on the properties, with annual rent of $3,000,000 and rental increases of 2.5 percent annually.  Ashland countered proposing a one-year lease term with options to renew, annual rent of $1,000,000, and an acknowledgment that Ashland owned the improvements on the properties.  Following Ashland's proposal, SuperAsh decided to suspend the lease negotiations.

{¶ 18} The parties stipulated that from 2014 to July 31, 2022, Speedway made capital improvements to the properties at a total cost of $11,877,976.80.  Speedway's expenditures improved the stores at the properties and Speedway has not been reimbursed for the improvements.

{¶ 19} Ashland filed a complaint asserting claims for declaratory judgment and specific performance of the ground leases on April 12, 2022.  Ashland asked the trial court to declare that it had effectively exercised the option to renew the ground leases for the 2022 term in August 2021.  SuperAsh filed a counterclaim asserting claims for forcible entry and detainer, breach of the ground leases, and declaratory judgment.  SuperAsh also filed separate actions in Kentucky seeking to evict Ashland from the properties located in that state.  Ashland and Speedway filed motions in the present case to enjoin SuperAsh from proceeding with any eviction action concerning the properties.

{¶ 20} SuperAsh filed a Civ.R. 12(B)(6) motion to dismiss the claims brought by Ashland Global Holdings Inc., because that entity was not a party to the ground leases. Ashland opposed the motion to dismiss.

{¶ 21} On July 1, 2022, Speedway filed a Civ.R. 24 motion to intervene in the action and participate as a plaintiff.  Speedway asserted it held an equitable interest in the properties because, on January 29, 2022, the arbitration panel in the Speedway/Ashland arbitration issued an award obligating Ashland to "use its commercially reasonable best efforts to acquire the Properties from SuperAsh" and transfer the properties "with the

---

[2] The tolling agreements specified that, if the parties reached a new lease agreement, the rent Ashland paid under the tolling agreements would be applied to the rent due under the new lease.

improvements located thereon, unencumbered to Speedway." (Mot. to Intervene, Ex. E, Arbitration Award at 22.) On July 15, 2022, the court granted Speedway intervention to assert its claim for declaratory judgment. Speedway sought the same declaratory judgment as Ashland.

**{¶ 22}** On August 12, 2022, the trial court denied SuperAsh's motion to dismiss Ashland Global Holdings Inc. and denied plaintiffs' motions to enjoin SuperAsh. The court reviewed Ashland's corporate structure and determined that Ashland Global Holdings Inc. was a proper party in the present action. The court concluded SuperAsh could proceed with the out-of-state eviction actions, because the ground leases specified that the laws of the state where each property was located governed each lease. The trial court also bifurcated the declaratory judgment claims of all the parties from SuperAsh's forcible entry and detainer claim and stated it would hold a trial on the declaratory judgment claims beginning September 19, 2022. The court noted that a judge "in another jurisdiction might elect to invoke concepts of comity and judicial efficiency to await rulings here." (Aug. 12, 2022 Decision at 5.)

**{¶ 23}** On August 26, 2022, the court issued an entry compelling SuperAsh to produce certain documents in discovery. The court explained that following a "heated discussion" between counsel in open court, the court ordered an in camera inspection of SuperAsh's privilege log and the documents SuperAsh claimed were protected by the attorney-client privilege and/or the work-product doctrine. (Aug. 26, 2022 Entry at 1.) The court concluded that SuperAsh should have produced several of the documents with redactions, because the documents were principally "business memoranda" and contained only "isolated statements about what a lawyer advised Mr. Woldenberg." (Aug. 26, 2022 Entry at 2.) The court redacted some of the documents for SuperAsh and attached the redacted documents to the August 26, 2022 entry. The court also ordered SuperAsh to produce several documents SuperAsh claimed were protected work product because the documents either "[did] not qualify [as work product] at all" or " 'good cause' exist[ed] for production in the context of this case under Civ.R. 26(B)(4)." (Aug. 26, 2022 Entry at 5.)

**{¶ 24}** The parties submitted pre-trial briefs to the court addressing the pertinent issues for trial. Whitaker, Woldenberg, and SuperAsh's external real estate advisor, B.J. Feller, testified at the three-day trial commencing September 19, 2022.

{¶ 25} On September 27, 2022, the court issued a declaratory judgment and an opinion. The court determined that, due to the no waiver clause in the ground leases, SuperAsh's acceptance of the late 2021 renewal notice did not waive SuperAsh's right to receive a timely renewal notice in the future. However, the court determined that "equity [could] come to the aid of someone making an innocent, unintended error under a lease" and the court found Ashland entitled to equitable relief. (Opinion at 12.) The court noted that the delay between September 3 and November 3, 2021 was "slight" in the "context of the long relationship between these parties." (Opinion at 16.) The court found that Ashland intended to deliver the 2022 renewal notice to SuperAsh in August 2021, Ashland failed to provide SuperAsh with the 2022 renewal notice due to "an honest mistake," Ashland and Speedway would forfeit millions of dollars in valuable improvements on the properties if the ground leases terminated, and that SuperAsh would suffer no harm if the court granted equitable relief. The court found that SuperAsh's acceptance of rent from Ashland for the last two weeks of April 2021 after the fourth tolling agreement expired estopped SuperAsh from claiming the ground leases terminated on December 31, 2021.

{¶ 26} The court granted plaintiffs' claims for declaratory judgment, granted Ashland's claim for specific performance of the ground leases, denied SuperAsh's claims for breach of the ground leases and declaratory judgment, and dismissed SuperAsh's claim for forcible entry and detainer. On October 3, 2022, the court issued an amended declaratory judgment stating that, although the court's factual findings concerned all 24 properties, the court's judgment was binding only as to the 8 properties located in Ohio.

## II. Assignments of Error

{¶ 27} SuperAsh appeals and assigns the following two assignments of error for our review:

> [I.] The trial court committed reversible error by invoking equity to allow Appellees Ashland Global Holdings, Inc. and Ashland, LLC (unless otherwise noted, collectively "Ashland") to renew the leases with Appellant SuperAsh Remainderman Limited Partnership ("SuperAsh") in direct contravention of the express terms and requirements of the leases regarding exercise of the renewal options.
>
> [II.] The trial court committed reversible error by compelling SuperAsh to produce materials prepared in anticipation of litigation and containing advice from its attorneys to Ashland

and Appellee Speedway LLC and by allowing such materials to be admitted into evidence at trial and play a central role in the trial court's judgment for Ashland and Speedway.

## III. First Assignment of Error – Equitable Relief

{¶ 28} SuperAsh's first assignment of error contends the trial court erred by invoking equity to permit Ashland to renew the ground leases for the 2022 term. The trial court issued a declaratory judgment finding that Ashland was entitled to equitable relief and the court granted Ashland's request for specific performance of the ground leases.

{¶ 29} R.C. Chapter 2721, the Declaratory Judgments Act, is remedial in nature; its purpose is to settle and afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations. *T & M Machines, L.L.C. v. Atty. Gen.*, 10th Dist. No. 19AP-124, 2020-Ohio-551, ¶ 15, citing *Swander Ditch Landowners' Assn. v. Joint Bd. of Huron & Seneca Cty. Commrs.*, 51 Ohio St.3d 131, 134 (1990). An action for declaratory judgment is "*sui generis* in the sense that it is neither one strictly in equity nor one strictly at law; it may possess attributes of both. * * * [I]n determining the issues presented [in a declaratory judgment action] such principles of law or of equity may be invoked as are appropriate." *Sessions v. Skelton*, 163 Ohio St. 409, 415 (1955). Thus, when a declaratory judgment action "partakes of equity it calls for the application of equitable principles." *Id. Accord Sterling Drug, Inc. v. Wickham*, 63 Ohio St.2d 16, 21 (1980); *Pickrel v. Hrobon*, 106 Ohio App. 313, 314 (10th Dist.1958). An action for specific performance of a contract is a "matter[] in equity." *Sandusky Props. v. Aveni*, 15 Ohio St.3d 273, 274 (1984). *Accord Holstein v. Crescent Communities, Inc.*, 10th Dist. No. 02AP-1241, 2003-Ohio-4760, ¶ 13.

{¶ 30} " 'The standard of review applicable to claims for equitable relief is abuse of discretion.' " *Byers v. Robinson*, 10th Dist. No. 08AP-204, 2008-Ohio-4833, ¶ 57, quoting *McCarthy v. Lippitt*, 150 Ohio App.3d 367, 2002-Ohio-6435, ¶ 22 (7th Dist.). *Accord RR. Sav. & Loan Co. v. Berman*, 10th Dist. No. 89AP-626 (Mar. 22, 1990) (stating that whether to grant specific performance is a "matter[] of equitable law and will not be reversed absent an abuse of discretion"); *Keybank, N.A. v. MRN Ltd. Partnership*, 193 Ohio App.3d 424, 2011-Ohio-1934, ¶ 32 (8th Dist.) (stating that a "trial court's decision to apply equitable principles in a given case is discretionary"); *Holstein* at ¶ 13. An abuse of discretion implies that the court's attitude is unreasonable, arbitrary or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). *See also Huffman v. Hair Surgeon, Inc.*, 19 Ohio

St.3d 83, 87 (1985); *Newsome v. Mt. Carmel Health Sys.*, 10th Dist. No. 05AP-169, 2005-Ohio-6853, ¶ 3, citing *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161 (1990) (stating that an "appellate court is not permitted to find an abuse of discretion merely because it would have arrived at a different result if it had reviewed the matter de novo").

{¶ 31} SuperAsh contends that, pursuant to the plain language of the ground leases, the leases expired on December 31, 2021 because Ashland did not exercise its option to renew the ground leases by September 3, 2021. *See Ritchie v. Cordray*, 10 Ohio App.3d 213, 215 (10th Dist.1983) (stating that an "option is an agreement to keep an offer open for a specified time," and that "where an offer prescribes the place, time, or manner of acceptance, those terms must be strictly complied with by the offeree," but that "strict compliance can be waived by the offeror"); *Mother Ruckers, Inc. v. Viking Acceptance, Inc.*, 2d Dist. No. 7890 (Jan. 13, 1983). Leases are contracts and subject to traditional rules of contract interpretation. *Atelier Dist., L.L.C. v. Parking Co. of Am., Inc.*, 10th Dist. No. 07AP-87, 2007-Ohio-7138, ¶ 16, citing *Mark-It Place Foods, Inc. v. New Plan Excel Realty Trust, Inc.*, 156 Ohio App.3d 65, 2004-Ohio-411, ¶ 29 (4th Dist.). " 'Contracts are to be interpreted so as to carry out the intent of the parties, as that intent is evidenced by the contractual language.' " *Id.*, quoting *Skivolocki v. E. Ohio Gas Co.*, 38 Ohio St.2d 244 (1974), paragraph one of the syllabus.

{¶ 32} SuperAsh contends the trial court erred by relying on equity to resolve the present dispute because "[w]hen contracting parties 'have fixed their contractual relationship in an express contract . . . there is no reason or necessity' for equity to apply." (Appellant's Brief at 30, quoting *Bunta v. Superior VacuPress, L.L.C.*, ___ Ohio St.3d ___, 2022-Ohio-4363, ¶ 39.) *See also Dugan v. Meyers Constr. Co., Inc. v. Ohio Dept. of Adm. Servs.*, 113 Ohio St.3d 226, 2007-Ohio-1687, ¶ 29, quoting *Ohio Crane Co. v. Hicks*, 110 Ohio St. 168, 172 (1924) (stating that " 'where a contract is plain and unambiguous, it does not become ambiguous by reason of the fact that in its operation it will work a hardship upon one of the parties thereto and a corresponding advantage to the other' "); *Stanley Miller Constr. Co. v. Ohio School Facilities Comm.*, 10th Dist. No. 10AP-298, 2010-Ohio-6397, ¶ 12, quoting *Cleveland Constr., Inc. v. Kent State Univ.*, 10th Dist. No. 09AP-822,

2010-Ohio-2906, ¶ 31 (stating that courts " 'cannot decide cases of contractual interpretation on the basis of what is just or equitable' ").

{¶ 33} However, the Supreme Court of Ohio's holding that "the clear and unambiguous language of a contract cannot be altered through the application of equitable principles * * * arose in the context of unjust enrichment or *quantum meruit* claims where one party sought to recover more than it had previously bargained for during the contract negotiations." *Sierra 76, Inc. v. TA Operating, L.L.C.*, 848 F.Supp.2d 812, 815 (N.D.Ohio 2012), citing *Dugan* at ¶ 29; *Ervin v. Garner*, 25 Ohio St.2d 231, 239-40 (1971); *Ullmann v. May*, 147 Ohio St. 468, 476 (1947). *Bunta*, on which SuperAsh relies, concerned a claim for unjust enrichment. *See Bunta* at ¶ 39 (holding that the "doctrine of unjust enrichment is limited when an express contract exists that concerns the same subject"). The present case does not involve a claim for unjust enrichment or quantum meruit.

{¶ 34} The appellate courts of this state, including this court, have held that a court may grant a tenant equitable relief from the tenant's failure to submit a notice at the time, or in the form and manner, required as a condition precedent to the renewal of a lease. *See Ward v. Washington Distribs. Inc.*, 67 Ohio App.2d 49 (6th Dist.1980); *Capuano v. Epic Properties*, 10th Dist. No. 94APE03-311 (Sept. 15, 1994); *Vivi Retail, Inc. v. E&A Northeast Ltd. Partnership*, 8th Dist. No. 90527, 2008-Ohio-4705, ¶ 20. *See also Dayton Metro. Hous. Auth. v. Kilgore*, 194 Ohio App.3d 767, 2011-Ohio-3283, ¶ 24 (2d Dist.), quoting 41 Ohio Jurisprudence 3d, Equity, Section 36 (stating that " '[e]ven where a cause of forfeiture is specifically mentioned in the lease, equitable considerations enter into the determination of such forfeiture and may relieve the lessee technically subject to forfeiture' "); *Great N. Savings Co. v. Ingarra*, 9th Dist. No. 9433 (Apr. 23, 1980). The Supreme Court "has never applied the general prohibition against equitable intervention to a case involving a commercial tenant's failure to timely exercise a renewal option on a lease." *Sierra 76, Inc.* at 815.

{¶ 35} In *Ward*, the court noted the "well-settled rule" that, "unless the delay in renewing [a lease] is so great as to be inexcusable, a [tenant's] failure to renew within the specified time will not preclude equitable relief." *Id.* at 53, citing *Jones v. Gianferante*, 305 N.Y. 135 (Ct.App.NY 1953). The court held that equity can relieve a lessee from the consequences of a failure to give the notice required as a condition precedent to the renewal

of a lease "where such failure result[ed] from accident, fraud, surprise or honest mistake, and has not prejudiced the lessor." *Id.* at paragraph one of the syllabus. The court further held that, even in the absence of an honest mistake by the lessee, "where the lessee has made valuable improvements to the leased premises, the lessee should not be denied equitable relief from his own neglect or inadvertence if a forfeiture of such improvements would result -- provided, there is no prejudice to the landlord." *Id.* at paragraph four of the syllabus.

{¶ 36} In *Ward*, the landlord and tenant executed a lease for a specified term, and the lease permitted the tenant to renew the lease by providing the landlord notice "at least 30 days before the end of the preceding term." *Id.* at 51. The landlord and tenant subsequently executed a supplement to the lease that altered the initial term. *Id.* On June 16, 1967, the landlord wrote the tenant a letter stating that the supplemented lease term began on December 1, 1966. However, "due to an apparent clerical error" the tenant did not place the letter "in the proper lease file" and prepared a lease digest sheet containing an incorrect lease expiration date for the property. *Id.* As a result, the tenant believed the notice to renew the lease was due January 30, 1979, when it was due November 1, 1978. *Id.* The tenant received a letter from the landlord on November 27, 1978, stating that the lease would expire November 30, 1978. On December 1, 1978, the tenant telephoned and sent a letter to the landlord attempting to renew the lease. *Id.* at 52. The *Ward* court found the tenant's failure to timely renew the lease the result of an honest mistake, "to wit, the misreading of the lease and the misfiling of the landlord's June 16, 1967, letter." *Id.* at 53. The court also found that the tenant would lose "$72,589 of unamortized leasehold improvements and fixtures if they were deprived of their right of renewal." *Id.* at 52. Because the landlord would not be prejudiced by the renewal, the court held that the tenant's December 1, 1978 letter effectively exercised the option to renew the lease. *Id.* at 56.

{¶ 37} A significant number of Ohio courts have applied the equitable principles announced in *Ward* with approval. *See KeyBank, N.A.*, 2011-Ohio-1934, at ¶ 53; *Vivi Retail, Inc.*, 2008-Ohio-4705, at ¶ 21-23; *Gehret v. Rismiller*, 2d Dist. No. 06CA1705, 2007-Ohio-1893, ¶ 24-25; *Molner v. Castle Bail Bonds, Inc.*, 4th Dist. No. 04CA2808, 2005-Ohio-6643, ¶ 48-50, 72; *Convenient Food Mart, Inc. v. Atwell Properties, Ltd.*, 11th Dist.

No. 2003-L-174, 2005-Ohio-704, ¶ 25-26; *Burns v. Norcott*, 12th Dist. No. CA97-08-036 (Mar. 30, 1998); *Paterakis v. Estate of Tuma*, 66 Ohio App.3d 373, 376-77 (8th Dist.1990); *Gentithes Trust v. Patio Enclosures, Inc.*, 11th Dist. No. 89-T-4226 (July 6, 1990); *Mentor Lagoons, Inc. v. Ventra*, 11th Dist. No. 89-L-14-026 (Sept. 7, 1990); *Evans v. Bauer*, 2d Dist. No. 2445 (Aug. 31, 1989); *Urology Servs., Inc. v. Greene*, 8th Dist. No. 50205 (Mar. 6, 1986); *Benton v. Tecumseh Corrugated Box Co.*, 6th Dist. No. WD-85-9 (Oct. 25, 1985). *See also Sierra 76, Inc.* at 817 (applying the equitable principles announced in *Ward* to a diversity case applying Ohio law).[3]

**{¶ 38}** In *Capuano*, we held that a court could "relieve a lessee from the consequences of a tardy renewal of a lease when the lessee meets the requirements for obtaining equitable relief * * * set forth" in *Ward*. *Id*. The tenant in *Capuano* "had a copy of the lease at all times," was "aware" of the renewal option in the lease, did "not maintain any system for reminding him of the renewal date," and simply "attempted to exercise his option about seven weeks late." *Id*. As such, the record demonstrated that the tenant's failure to timely submit the renewal notice resulted from negligence rather than an honest mistake. *Id*. The tenant had not made improvements to the leased premises and, after the tenant failed to renew the lease, the landlord and the subtenant who occupied the premises "entered into a new lease for the premises." *Id*. Accordingly, the tenant in *Capuano* was not entitled to equitable relief pursuant to the equitable principles announced in *Ward*.

**{¶ 39}** SuperAsh notes that one Ohio court has disagreed with *Ward's* holding. In *Fifth Third Bank W. Ohio v. Carrol Bldg. Co.*, 180 Ohio App.3d 490, 2009-Ohio-57 (2d Dist.), the court found *Ward's* holding regarding equitable relief irreconcilable "with the supreme court's holdings that unambiguous contractual language must be enforced as written, even when it will work a hardship on one party (or parties) and an advantage to another." *Carroll Bldg. Co.* at ¶ 16. The tenant in *Carroll Bldg. Co.* defaulted on mortgage obligations secured by its leasehold interest, and the court appointed a receiver who made timely payments on the tenant's obligations. *Id*. at ¶ 4-5. Although the receiver "had the

---

[3] Many courts outside of Ohio also permit equity to relieve a lessee from their failure to timely submit a notice to renew a lease. *See, e.g., Duncan v. G.E.W., Inc.*, 526 A.2d 1358, 1364 (D.C.App.1987), quoting Annot., 27 A.L.R. 4th 266, 271 (1984) (stating that in jurisdictions that accept and enforce the honest mistake doctrine, equity will relieve a tenant from their failure to submit a timely notice of renewal if " '(1) the tenant's delay in renewing was slight, (2) delay did not prejudice the landlord, and (3) failure to grant relief would cause a tenant unconscionable hardship' ").

authority to exercise the lease options," the receiver did not provide the landlord with the tenant's renewal notice by the date specified in the lease. *Id.* at ¶ 6. The appellate court reversed the trial court's conclusion that the tenant was entitled to equitable relief under *Ward*. The appellate court explained that it disagreed with *Ward*'s holding and that the "evidence [in the case did] not support the trial court's conclusion that the circumstances justified" equitable relief. *Carroll Bldg. Co.* at ¶ 17.

{¶ 40} SuperAsh notes that *Ward* is not controlling authority in this court and contends that we should not find *Ward* to be persuasive authority either, considering *Carroll Bldg. Co.* As an appellate court in this state, " '[w]e are bound by the decisions of the Supreme Court and generally, by past precedent produced by our own district. Decisions from our sister districts, while assistive and many times highly persuasive, neither bind this court nor the various trial court's within its jurisdiction.' " *Estate of Auckland v. Broadview NH, L.L.C.*, 10th Dist. No. 16AP-661, 2017-Ohio-5602, ¶ 21, quoting *Keytack v. Warren*, 11th Dist. No. 2005-T-0152, 2006-Ohio-5179, ¶ 51. *Accord Stapleton v. Holstein*, 131 Ohio App.3d 596, 598 (4th Dist.1998). As noted, the Supreme Court has never addressed whether equity may relieve a tenant from their failure to timely exercise an option to renew a lease and, in *Capuano*, this court adopted and applied the equitable principles announced in *Ward*. The *Carroll Bldg. Co.* court's conclusion regarding *Ward* has not been adopted by another court in this state, while many Ohio appellate courts have adopted *Ward*'s holding.[4] Considering the foregoing, the trial court did not err by following this court's prior precedent in *Capuano* and applying the equitable principles announced in *Ward* to the present case.

{¶ 41} Under *Ward*, a court may grant a tenant equitable relief from the tenant's failure to timely submit a notice to renew a lease if: (1) the failure resulted from accident, fraud, surprise, or honest mistake and the landlord would not be prejudiced, or (2) even in the absence of an honest mistake, the tenant made valuable improvements to the leased property and the landlord would not be prejudiced. *Capuano*, citing *Ward*. Thus, under either scenario, a court must find that the landlord will not suffer prejudice. In this context, the prejudice to the landlord "must arise from the delay itself. Specifically, the landlord

---

[4] *See also Starvaggi Indus., Inc. v. Weirton Plaza Dev., Ltd. Partnership*, N.D.W.V. Dist. No. 5:14CV66 (STAMP) (Mar. 3, 2015) (a federal case applying Ohio law and stating that, while the court agreed with the analysis in *Carrol Bldg. Co.*, the "same result occur[red]" even if the court applied *Ward*).

must have changed his position in reliance upon the late notice." *Vivi Retail, Inc.*, 2008-Ohio-4705, at ¶ 22.

{¶ 42} In *Vivi Retail, Inc.*, the court concluded the landlord had not changed its position in reliance on the tenant's late notice because the landlord "had not secured another tenant nor had it entered into a lease agreement with another tenant" following the tenant's late renewal notice. *Vivi Retail, Inc.*, at ¶ 23. *See also KeyBank, N.A.*, 2011-Ohio-1934, at ¶ 57 (finding no evidence of prejudice because the landlord "just maintained the status quo" and "did not invest any money, did not incur any expense, and did not obtain a mortgage on the building" after the tenant failed to exercise a purchase option under the lease); *Convenient Food Mart, Inc.*, 2005-Ohio-704, at ¶ 26 (finding evidence of prejudice because the landlord "entered into a lease agreement with another lessee subsequent to [the tenant's] failure to timely renew").

{¶ 43} The trial court concluded that SuperAsh would suffer no prejudice if the court granted Ashland equitable relief because SuperAsh "took no action in reliance on the absence of timely notice." (Am. Declaratory Jgmt. at ¶ 2.) The court noted that between September 3 and November 3, 2021, SuperAsh "did not change its position, or even genuinely anticipate that Ashland would not renew." (Opinion at 8.) The record supports the court's conclusions.

{¶ 44} Woldenberg acknowledged that, aside from "reaching out to Speedway and being turned down," SuperAsh did not even attempt to market the properties for sale or lease. (Tr. Vol. I at 203.) Woldenberg affirmed that SuperAsh had not made any improvements to the properties, taken mortgages out on the properties, or listed the properties with a broker or real estate agent in reliance on the late notice. Woldenberg admitted that in 2021, he "suspected that Ashland would want to renew [the ground leases] for 2022." (Tr. Vol. II at 52.)

{¶ 45} Feller stated that SuperAsh did not even "try to negotiate" with leasing brokers to list the properties, because SuperAsh believed that "no leasing broker would be willing to undertake the leasing assignment" due to the present dispute. (Tr. Vol. II at 103, 119.) However, even when litigation regarding a late renewal notice seems likely, a lessor may demonstrate prejudice by entering into a conditional lease with a prospective tenant. *See Capuano* (noting that the landlord and subtenant "entered into a new lease for the

premises which lease [was] contingent upon [the landlord] prevailing in th[e] litigation"); *Sierra 76, Inc.* at 813 (stating that after the tenant failed to submit a timely renewal notice, the landlord entered into a lease with another tenant which was "conditional, depending on the outcome of this litigation"); *Starvaggi Indus. v. Weirton Plaza Dev. Ltd. Partnership*, N.D.W.V. No. 5:14CV66 (STAMP) (Mar. 3, 2015). Although SuperAsh reached out to Speedway, Speedway "refused to engage in any kind of negotiations with [SuperAsh]" and "made it clear they didn't want to speak to [SuperAsh]." (Tr. Vol. I at 192, Vol. II at 12.) SuperAsh's unsuccessful attempt to negotiate a lease with Speedway did not establish prejudice resulting from the late notice. *See Vivi Retail, Inc.* at ¶ 23 (noting that although the landlord "engaged in negotiations with another" potential tenant, the negotiations did not establish prejudice because the landlord "did not enter into a lease" with the potential tenant).

{¶ 46} SuperAsh contends it will suffer prejudice if Ashland is permitted to renew the ground leases because it "will lose its express contractual right to the property and its improvements" and because "the rent under the [ground] leases" for the 2022 term "was considerably less than fair market value." (Appellant's Brief at 48.) However, these alleged instances of prejudice simply concern the provisions in the ground leases regarding the improvements and rent. Neither situation amounts to a change of position by SuperAsh in reliance on the late 2022 renewal notice. While SuperAsh contends the trial court "artificially limited the time period for consideration of prejudice to September 3, 2021 to November 3, 2021," SuperAsh does not allege that it changed its position in reliance on Ashland's late renewal notice after November 3, 2021. (Appellant's Brief at 49.) Woldenberg acknowledged at trial that, even after November 3, 2021, SuperAsh did not secure a new tenant for the properties or attempt to sell the properties.

{¶ 47} Had SuperAsh taken serious steps to attempt to secure new tenants or sell the properties after Ashland failed to submit the 2022 renewal notice the balance of the equities may have tipped in SuperAsh's favor. However, the record demonstrates that SuperAsh did not change its position in reliance on the late 2022 renewal notice in any way. As such, the trial court did not abuse its discretion by finding that SuperAsh would not suffer prejudice if the court granted Ashland equitable relief.

{¶ 48} SuperAsh does not allege the trial court erred by concluding that Ashland and Speedway would forfeit millions of dollars in valuable improvements on the properties in the absence of equitable relief. In *Capuano*, we explained that, while the failure to exercise an option "does not result in forfeiture" of the option itself, it may result in a forfeiture of the "valuable improvements on the property [that the tenant made] in good faith, intending to renew the lease." *Id.*, citing *J.N.A. Realty Corp. v. Cross Bay Chelsea, Inc.*, 397 N.Y.S.2d 958, 960-61 (1977). *See also KeyBank, N.A.*, 2011-Ohio-1934, at ¶ 59; *Benton.* Ashland purchased the improvements on the properties in 2013 for $13,770,000 and Speedway spent $11,877,976.84 in improvements to the properties between 2014 and 2022. Accordingly, even in the absence of an honest mistake, because plaintiffs would forfeit millions of dollars of valuable improvements on the properties if the leases terminated and SuperAsh would not be prejudiced, the trial court did not abuse its discretion by granting plaintiffs equitable relief.

{¶ 49} We also find that, under the unique facts of the present case, the trial court did not abuse its discretion by determining that Ashland's failure to timely submit the 2022 renewal notice resulted from an honest mistake. The *Ward* court explained that equity will not tolerate a forfeiture "where the lessees' delay [in submitting the renewal notice] was attributable to * * * an honest mistake, where there was no willful or deliberate act or omission of the lessees." *Ward* at 54. When a tenant has full knowledge of the lease renewal date and does not attempt to submit a timely renewal notice, the tenant's failure to do so results from a willful omission rather than an honest mistake. *See Convenient Food Mart, Inc.*, 2005-Ohio-704, at ¶ 26 (finding no evidence of honest mistake because "both [tenants] knew exactly when the lease term ended," and the tenants did not even "attempt to exercise the second renewal option until they sent the [renewal notice] * * * a full month and a half after the deadline had passed"); *Gehret*, 2007-Ohio-1893, at ¶ 25 (finding no evidence of honest mistake because the option-holder had "full knowledge of the deadline for providing written notice" and simply "failed to provide written notice by either of the two methods available to him in the option"); *Burns*; *Paterakis* at 377; *Capuano*; *Starvaggi Indus.*

{¶ 50} In contrast, where a tenant is reasonably mistaken regarding the renewal date or takes reasonable steps to submit a timely renewal notice, the tenant's failure to submit

the renewal notice may result from an honest mistake. *See Ward* at 53; *Evans* (finding the tenant made an honest mistake regarding the renewal date because the termination date in the lease was ambiguous); *Vivi Retail, Inc.*, at ¶ 21-23 (finding evidence of honest mistake because the landlord usually "notified [the tenant] in advance when he need[ed] to exercise his renewal option by a certain date" and the landlord "testified that he believed that [the tenant's] failure to timely renew was an honest mistake"); *Sierra 76, Inc.*, 848 F.Supp.2d at 817-18 (finding genuine issues of material facts regarding whether a "computer malfunction[]" that "somehow eras[ed]" the programmed notifications in the tenant's president's computer, including the notification regarding the lease renewal date, amounted to "accident, surprise or honest mistake").

{¶ 51} The evidence demonstrated that Wallach prepared the 2022 renewal notice in August 2021, Whitaker signed the 2022 renewal notice on August 11, 2021 and returned the signed 2022 renewal notice to Wallach as instructed. On August 12, 2021, Wallach emailed a copy of the signed renewal notice to Valvoline, stating that the renewal notice had been "sent by Ashland to [SuperAsh]" as was "the case last year." (Joint Ex. 9.) When Woldenberg emailed Whitaker on November 3, 2021, Whitaker responded to the email in 15 minutes attaching the 2022 renewal notice to the email. *Compare Urology Servs., Inc.* (noting that "[e]ven if [the tenant's] failure to timely exercise the option was due to an 'honest mistake,' the fact that" the tenant waited "almost one month" to respond to the landlord's letter regarding the late renewal notice demonstrated "a lack of diligence and good faith on the part of [the] appellant").

{¶ 52} SuperAsh contends that Ashland failed to present evidence demonstrating why it did not send the 2022 renewal notice to SuperAsh or that it intended to renew the ground leases for the 2022 term. However, Whitaker testified it was his "understanding [Wallach thought he] was going to send it and [he] thought [Wallach] was going to send it." (Tr. Vol. I at 128.) Whitaker stated that the failure to send the 2022 renewal notice to SuperAsh was the result of a "miscommunication" between "[Wallach] and myself." (Tr. Vol. I at 128.) In *Benton*, the court held that where the tenant failed to timely submit a notice under the lease due to "a failure in communication between [the tenant] and his attorney, each believing that the other would send the required written notice," the failure to submit the notice resulted from an "honest mistake."

{¶ 53} Whitaker explained that, because he "signed [the 2022 renewal notice], it was clearly the intent that [Ashland was] planning to renew." (Tr. Vol. I at 52.) Whitaker admitted that due to the separate lawsuits, he was unsure exactly who would send the renewal notice to SuperAsh. Whitaker also noted that, if there had been any need "to not renew it, [he] would have assumed somebody at that point would have told [him] that we weren't renewing." (Tr. Vol. I at 52.) However, Whitaker reiterated that "the intent after [him] signing it was to renew." (Tr. Vol. I at 77.)

{¶ 54} Although SuperAsh contends Ashland may have withheld the 2022 renewal notice "pursuant to some strategy being pursued against Speedway and Valvoline" in the separate lawsuits, SuperAsh cites nothing to support this contention. (Appellant's Brief at 48.) Notably, Wallach's August 12, 2021 email to Valvoline resolved the issue of which party would send the renewal notice to SuperAsh in that litigation. The trial court appropriately found "no evidence that Ashland's delay was a calculated strategy." (Opinion at 11.)

{¶ 55} The trial court found Whitaker's testimony regarding the 2022 renewal notice to be credible. An appellate court generally defers to the trial court's credibility determinations, because the trial court is in the best position "to evaluate the evidence by viewing the witnesses and observing their demeanor, voice inflections, and gestures." *Sparre v. Ohio Dept. of Transp.*, 10th Dist. No. 12AP-381, 2013-Ohio-4153, ¶ 12, citing *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). Accordingly, the evidence demonstrated that Ashland intended to renew the ground leases for the 2022 term, took reasonable steps to timely renew the ground leases by executing the renewal notice in August 2021, and that the failure to timely submit the renewal notice resulted from a miscommunication between Whitaker and Wallach regarding who would send the notice. As such, the evidence supported the trial court's conclusion that Ashland's failure to timely submit the 2022 renewal notice resulted from an honest mistake and that Ashland was entitled to equitable relief.

{¶ 56} SuperAsh contends the plaintiffs were ineligible for equitable relief in the present case because they both had adequate remedies at law. However, because the present case involved plaintiffs' request for equitable relief with respect to their leasehold interests in the subject properties, plaintiffs were entitled to equitable relief regardless of whether legal remedies may have also been available. *See Gleason v. Gleason*, 64 Ohio

App.3d 667, 672 (4th Dist.1991), quoting 71 American Jurisprudence 2d 144, Specific Performance, Section 112 (1973) (stating that " 'where land is the subject matter of the agreement, the jurisdiction of equity to grant [relief] does not depend upon the existence of special facts showing the inadequacy of a legal remedy in the particular case' "); *Sholiton Industries, Inc. v. Wright State Univ.*, 2d Dist. No. 95-CA-101 (Sept. 20, 1996) (noting that "this principle applies equally to leasehold interests in commercial property"); *Holstein*, 2003-Ohio-4760, at ¶ 16, quoting *Link v. Burke*, 5 Ohio Law Abs. 676, 677 (8th Dist.1926).

{¶ 57} SuperAsh further contends that Ashland was ineligible for equitable relief because it came to the case with unclean hands. All equitable doctrines are "subject to the fundamental doctrine that 'he who seeks equity must do equity, and that he must come into court with clean hands.' " *State ex rel. Commt. for the Referendum of Lorain Ordinance No. 77-01 v. Lorain Cty. Bd. of Elections*, 96 Ohio St.3d 308, 2002-Ohio-4194, ¶ 35, quoting *Christman v. Christman*, 171 Ohio St. 152, 154 (1960). "[T]he doctrine of unclean hands requires a showing that [the party at issue] engaged in reprehensible conduct, not merely negligent conduct." *State ex rel. Columbus Coalition for Responsive Govt. v. Blevins*, 140 Ohio St.3d 294, 2014-Ohio-3745, ¶ 12, citing *State ex rel. Coughlin v. Summit Cty. Bd. of Elections*, 136 Ohio St.3d 371, 2013-Ohio-3867, ¶ 16. *See Wiley v. Wiley*, 3d Dist. No. 9-06-34, 2007-Ohio-6423, ¶ 15. The trial court summarily rejected SuperAsh's unclean hands arguments, finding "no colorable showing of reprehensible misconduct by Ashland or by Speedway." (Opinion at 16.)

{¶ 58} SuperAsh initially contends that Ashland had unclean hands in the present action because it filed suit against Valvoline, Speedway, and SuperAsh. SuperAsh cites no authority, and we find none, to support its contention that filing a non-frivolous lawsuit could support a finding of unclean hands. SuperAsh further contends that Ashland came to court with unclean hands due to its conduct toward Speedway and Valvoline in the separate lawsuits. However, the unclean hands doctrine " 'requires only that the plaintiff must not be guilty of reprehensible conduct with respect to the subject-matter of his suit.' " *Goldberger v. Bexley Properties*, 5 Ohio St.3d 82, 85 (1983), quoting *Kinner v. Lake Shore & Michigan S. Ry. Co.*, 69 Ohio St. 339 (1904), paragraph one of the syllabus. *Accord N. Coast Cookies, Inc. v. Sweet Temptations, Inc.*, 16 Ohio App.3d 342 (8th Dist.1984), paragraph two of the syllabus (stating that the " 'clean hands' doctrine concerns grossly

inequitable behavior in the *underlying transaction* which is the subject matter of the suit"). (Emphasis sic.) Ashland's conduct toward Speedway and Valvoline in the separate lawsuits was not relevant to the clean hands issue in the present case.

{¶ 59} SuperAsh also asserts that Ashland engaged in reprehensible conduct because it failed to comply with the renewal provisions in the ground leases and initially "misrepresented" to SuperAsh that it had timely sent the 2022 renewal notice. (Appellant's Brief at 53.) Although Wallach indicated to SuperAsh on November 11, 2021 that Ashland had timely sent the 2022 renewal notice to SuperAsh, on November 14, 2021 Whitaker sent an email to Feller clarifying that Ashland was "unable to track down concrete evidence of the delivery." (Pltf.'s Ex. 13.) SuperAsh fails to demonstrate that Ashland engaged in reprehensible conduct with respect to the 2022 renewal notice. SuperAsh further contends that Ashland came to court with unclean hands because it "refused to allow Wallach, the only person who actually knew whether an honest mistake had occurred, to testify." (Appellant's Brief at 53.) While Ashland chose not to call Wallach as a witness, there is nothing in the record to support SuperAsh's contention that Ashland refused to allow Wallach to testify.[5] Accordingly, the trial court did not abuse its discretion by finding that Ashland came to court with clean hands in the present case.

{¶ 60} SuperAsh lastly asserts the trial court erred by finding equitable estoppel prevented SuperAsh from claiming the ground leases terminated on December 31, 2021. However, because we have already determined the trial court did not err by granting Ashland equitable relief, any error in the court's equitable estoppel analysis would amount to harmless error. *See* Civ.R. 61 (stating that a court "must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties"); *Motorists Mut. Ins. Co. v. Hall*, 10th Dist. No. 04AP-1256, 2005-Ohio-3811, ¶ 19; *Wallick Properties Midwest, L.L.C. v. Jama*, 10th Dist. No. 20AP-299, 2021-Ohio-2830, ¶ 20; *O'Brien v. Angley*, 63 Ohio St.2d 159, 164 (1980). *See also State ex rel. McGrath v. Ohio Adult Parole*

---

[5] The record demonstrates the trial court limited each party to three depositions during discovery. *See* Civ.R. 26(B)(6)(a) (stating that "the court may limit the number of depositions"). After SuperAsh met its deposition limit, it asked the trial court to allow it to depose Wallach. At a September 14, 2022 status conference, the trial court informed SuperAsh that it could not take Wallach's deposition before the upcoming trial date. However, the court stated SuperAsh could "revisit this [issue] after we see the testimony," and that the court could "potentially leave the record open and let [SuperAsh] go take [Wallach's] deposition" after trial. (Sept. 14, 2022 Status Conf. Tr. at 12.) There is nothing in the record indicating that SuperAsh attempted to take Wallach's deposition after the trial concluded.

*Auth.*, 100 Ohio St.3d 72, 2003-Ohio-5062, ¶ 8 (holding that "[r]eviewing courts are not authorized to reverse a correct judgment on the basis that some or all of the lower court's reasons are erroneous").  As such, we need not address SuperAsh's contentions regarding the trial court's equitable estoppel analysis.

{¶ 61} Based on the foregoing, SuperAsh's first assignment of error is overruled.

## IV. Second Assignment of Error – Privileged Documents

{¶ 62} SuperAsh's second assignment of error asserts the trial court erred by compelling SuperAsh to produce privileged documents and by admitting the allegedly privileged documents at trial.  SuperAsh contends the trial court erred by admitting plaintiff's exhibits 4, 7, 9, 13, 15, 16, and 17.

{¶ 63} The admission or exclusion of relevant evidence rests within the sound discretion of the trial court. *State v. Sage*, 31 Ohio St.3d 173 (1987).  "Error in the admission or exclusion of evidence is grounds for reversal only where substantial rights of the complaining party were affected or substantial justice appears not to have been done." *Jarvis v. Hasan*, 10th Dist. No. 14AP-578, 2015-Ohio-1779, ¶ 70, citing *Faieta v. World Harvest Church*, 10th Dist. No. 08AP-527, 2008-Ohio-6959, ¶ 73.  *See* Evid.R. 103(A)(1).  "To show an evidentiary ruling has affected a substantial right, the party must demonstrate that the alleged error impacted the final determination of the case."  *Jarvis* at ¶ 70, citing *Lips v. Univ. of Cincinnati College of Med.*, 10th Dist. No. 12AP-374, 2013-Ohio-1205, ¶ 49.

{¶ 64} At the conclusion of trial the parties provided the court with a list of "the exhibits to which the parties have agreed," which included plaintiff's exhibits 4, 7, 9, 13, 15, 16, and 17. (Tr. Vol. III at 4.)  SuperAsh did not object to any of the noted exhibits when they were admitted at trial.  SuperAsh also elicited testimony from the witnesses regarding some of the exhibits.  For instance, SuperAsh's counsel asked Woldenberg if he created plaintiff's exhibit 4, the February 22, 2021 analysis, "for presentation to [the SuperAsh] limited partners, as to whether to accept or reject the late November 2020 notice?"  (Tr. Vol. II at 36.)  Woldenberg affirmed that was why he created the analysis.  SuperAsh's counsel also asked Whitaker and Woldenberg about plaintiff's exhibit 13, the November 14, 2021 email Whitaker sent to Feller stating that Ashland could not find evidence demonstrating it delivered the 2022 renewal notice to SuperAsh.

{¶ 65} " 'In the absence of plain error, a failure to object to evidence presented at trial constitutes a waiver of any challenge on appeal.' " *Brooks-Lee v. Lee*, 10th Dist. No. 03AP-1149, 2005-Ohio-2288, ¶ 43, quoting *Barnett v. Thorton*, 10th Dist. No. 01AP-951, 2002-Ohio-3332, ¶ 20. *Accord Sain v. Roo*, 10th Dist. No. 01AP-360 (Oct. 23, 2001) (stating that where a party "fails to object to the admission of evidence at trial, all but plain error is waived"); Evid.R. 103(A)(1), (D). Although SuperAsh claimed the noted exhibits were privileged during discovery, SuperAsh needed to object and assert privilege at trial to preserve the issue for appeal. *See Akers v. Ohio State Univ. Med. Ctr.*, 10th Dist. No. 04AP-575, 2005-Ohio-5160, ¶ 20 (holding that, even if a party "assert[ed] privilege during discovery as to certain documents and testimony," the party's failure to "object and to assert privilege at trial constituted a waiver of any privilege with [respect to the document], at a minimum").

{¶ 66} In civil cases, "the plain error doctrine is not favored" and should be applied only in the "extremely rare case involving exceptional circumstances where error, to which no objection was made at the trial court, seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself." *Goldfuss v. Davidson*, 79 Ohio St.3d 116, 122-23 (1997). The civil plain error doctrine "implicates errors in the judicial process where the error is clearly apparent on the face of the record and is prejudicial to the appellant." *Brooks-Lee v. Lee*, 10th Dist. No. 11AP-284, 2012-Ohio-373, ¶ 26, citing *Reichert v. Ingersoll*, 18 Ohio St.3d 220, 223 (1985).

{¶ 67} SuperAsh does not explain how any of the noted exhibits influenced the trial court's final determination in the case. The trial court referenced plaintiff's exhibits 4, 7, 9, and 13 in its final opinion, but these exhibits were not the basis for the trial court's conclusion regarding equitable relief. Indeed, the court's opinion demonstrates that even in the absence of plaintiff's exhibits 4, 7, 9, 13, 15, 16, and 17, the court still would have found that SuperAsh did not change its position in reliance on the late notice, that Ashland and Speedway would forfeit millions of dollars in improvements if the ground leases terminated, and that Ashland's failure to timely submit the 2022 renewal notice was the result of an honest mistake. SuperAsh does not contend that the trial court's decision to admit the exhibits affected the basic fairness, integrity, or public reputation of the judicial

process.   As such, SuperAsh fails to demonstrate that the trial court plainly erred by admitting plaintiff's exhibits 4, 7, 9, 13, 15, 16, or 17.

{¶ 68}  Based on the foregoing, SuperAsh's second assignment of error is overruled.

**V. Conclusion**

{¶ 69}  Having overruled SuperAsh's two assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

LUPER SCHUSTER and EDELSTEIN, JJ., concur.

———————————